# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

IN RE U LOCK INC,

       Debtor.

No. 24-1163

---

GEORGE SNYDER,

       Appellant,

    v.

CHRISTINE BIROS,

       Appellee.

## RESPONSE OF CHRISTINE BIROS TO MOTION OF GEORGE SNYDER FOR RECONSIDERATION OF MOTION OF DISMISSAL

Christine Biros respectfully responds as follows to the Motion for Reconsideration of Dismissal and To Direct the Western Pennsylvania Clerk of Court to Accept Payment that George Snyder has filed with this Court at Docket Entry #6:

1.     Biros recognizes this Court's preference to avoid determining appeals on procedural matters. *See Horner Equipment International, Inc. v. Seascape Pool Center, Inc.*, 884 F.2d 89, 93 (3d Cir. 1989). She offers this response[1] so that this Court can fully exercise its sound discretion in considering Snyder's motion. *See id.*

---

[1] Biros submits this response now because, should Snyder pay the filing fee in compliance with this Court's Order of March 14, 2024, see Docket #7, he is unlikely to do so within the period for Biros's response to his motion. See Fed. R. App. P. 27(a)(3)(A).

2.    By the time that this Court dismissed this appeal on February 28, 2024, Snyder had not complied with *any* of his case-opening obligations. *See* Fed. R. App. 10(b)(1) (requiring appellant action on transcript); 3d Cir. L.A.R. 11.1 (discussing duty to pay for same); 3d Cir. L.A.R. 26.1.1 (requiring appellant to file disclosure statement). *See also Reach Communications Specialists, Inc., v. Sheriff of Philadelphia County*, No. 23-1496, 2023 U.S. App. LEXIS 24847, at \*2 (3d Cir. Apr. 12, 2023) (in dismissing appeal, noting that appellant had "not complied with other case-opening obligations").

3.    While there is no dispute that Snyder has identified himself as proceeding *pro se* in this appeal, Snyder cannot claim to be an inexperienced litigant.

4.    Snyder's personal participation in the *In re U Lock Inc.* bankruptcy proceeding in the U.S. Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") at No. 22-20823-GLT, from which this appeal arose, demonstrates a significant level of sophistication about court procedures:

- In connection with this appeal, Snyder submitted his claim to Bankruptcy Court in August 2022, participated in the proceedings in which the Bankruptcy Court rejected his claim, and took the 2023 appeal to the U.S. District Court for the Western District of Pennsylvania (the "District Court") from which he took this appeal.

- On July 7, 2023, Snyder filed a motion in the Bankruptcy Court at Docket No. 463 for "Allowance and Payment of Administrative Expense."

- On January 5, 2024, Snyder objected at Bankruptcy Court Docket Nos. 509, 513, and 517 to claims that Biros had submitted.

- As recently as January 22 of this year, Snyder appealed from a different decision of the Bankruptcy Court to the District Court. That appeal is now pending before the District Court at No. 2:24-cv-00135-CB.

In taking each of these actions, Snyder has claimed to be acting *pro se*.

5.      Snyder's ostensible level of sophistication has appeared elsewhere in the *In re U Lock* proceeding.  As one of two persons whom Snyder's sister, Shanni Snyder, identified as pre-petition managing control persons of U Lock,[2] Snyder presumably somehow caused U Lock, without the approval or participation of its trustee, to file an Adversary Proceeding in the Bankruptcy Court at No. 22-2048-GLT.  After the Bankruptcy Court dismissed that proceeding, U Lock, still acting separately from its trustee, appealed that decision to the District Court and then to this Court, in which U Lock's appeal is pending at No. 23-2293.

6.      While Biros appreciates that every appellee in her present posture can point to the prejudice that she or it will suffer in the expenditure of time, attention, and funds if a court restores an appeal to the docket, the universality of that situation does not lessen the actual prejudice to Biros that Snyder's motion presents here.  Even if this Court denies Snyder's motion, Biros will remain the appellee (and some combination of Snyder, his sister Shanni Snyder, and U Lock will remain the appellants) in two appeals pending before this Court and two appeals pending before the District Court.[3]

---

[2] A true and correct copy of Shanni Snyder's "Amended Involuntary Petition Against a Non-Individual" making this identification, which she filed with the Bankruptcy Court on May 9, 2022, is attached to this response as Exhibit 1.

[3] In addition to U Lock's appeal to this Court at No. 23-2293 and George Snyder's appeal to the District Court at No. 2:24-cv-00135-CB, both noted above, Biros is the appellee in Shanni Snyder's appeal to this Court at No. 24-1202 and in Shanni Snyder's March 14, 2024 appeal, which the District Court has not yet docketed, from the Bankruptcy Court's February 29, 2024 Order disallowing her claim in the *In re U Lock* proceeding and finding, after an evidentiary hearing, that Shanni

Respectfully submitted,

BERNSTEIN-BURKLEY, P.C.

Dated: March 18, 2024

By: *Stuart C. Gaul, Jr.*
Stuart C. Gaul, Jr., Esquire
PA ID #74529
601 Grant Street, 9th Floor
Pittsburgh, PA 15219
Telephone: 412-456-8100
Facsimile: 412-456-8135
Email: sgaul@bernsteinlaw.com

*Counsel for Appellee,*
*Christine Biros*

---

Snyder had lied to both that court and the District Court to prevent Biros's taking control of real property pursuant to state-court Orders. *See* Exhibit 2 at pp. 1-2. *See also id.* at p. 36 ("George's conduct is particularly suspect.").

# EXHIBIT 1

RECEIVED

MAY 0 9 2022

CLERK, U.S. BANKRUPTCY COURT
WEST DIST OF PENNSYLANIA

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

__WESTERN__  District of __PENNSYLVANIA__
(State)

Case number (If known): ~~22-20822    0~~  Chapter __7__

22-20823
(AKE)

Official Form 205

**Amended**

☒ Check if this is an amended filing

Amending Involuntary Petition placed in court mailbox on 4/25/2022.

12/15

# Involuntary Petition Against a Non-Individual

Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).

## Part 1:  Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed

| 1. Chapter of the Bankruptcy Code | Check one:<br>☒ Chapter 7<br>☐ Chapter 11 | **1a. Debtor has fewer than 12 eligible claim holders.**<br><br>**1b. Statement per W.Pa.LBR 1003-1:** Petitioning Creditor declares under the penalty for perjury that she does not know the precise share structure, identity of the Board of Directors, or the official officers of the Debtor. Based on information, there are between three and five officers and/or Board Members. Two managing control persons appear to be George Snyder and Kash Snyder. There also appears to be closely affiliated control creditors, but the total number of creditors are less than 12. _____ |

## Part 2:  Identify the Debtor

| 2. Debtor's name | U LOCK INC |
|---|---|

| 3. Other names you know the debtor has used in the last 8 years<br><br>Include any assumed names, trade names, or *doing business as* names. | U-LOCK INC.<br><br>_____<br><br>_____ |
|---|---|

**4. Debtor's federal Employer Identification Number (EIN)**

☐ Unknown

4 7 - 4 9 9 4 9 1 1
EIN

**5. Debtor's address**

| Principal place of business | Mailing address, if different |
|---|---|
| 14140  U.S. Route 30<br>Number      Street | _____<br>Number      Street |
| | _____<br>P.O. Box |
| N Huntingdon          PA    15642<br>City          State    ZIP Code | _____<br>City          State    ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| Westmoreland<br>County | _____<br>Number      Street |
| | _____ |
| | _____<br>City          State    ZIP Code |

22 20822

22-20823

| Debtor | U LOCK INC a/k/a U-LOCK INC. | Case number *(if known)* |
|---|---|---|
| | Name | |

**6.** **Debtor's website (URL)** _____

**7.** **Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other type of debtor. Specify: _____

**8.** **Type of debtor's business**

*Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the types of business listed.

☐ Unknown type of business.

**9.** **To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**

☒ No

☐ Yes. Debtor _____ Relationship _____

District _____ Date filed _____ Case number, if known _____
MM / DD / YYYY

Debtor _____ Relationship _____

District _____ Date filed _____ Case number, if known _____
MM / DD / YYYY

**Part 3:** **Report About the Case**

**10.** **Venue**

*Check one:*

☒ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.

☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

**11.** **Allegations**

Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).

The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

*At least one box must be checked:*

☒ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.

☒ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**12.** **Has there been a transfer of any claim against the debtor by or to any petitioner?**

☒ No

☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

22 20822

22 - 20823

| Debtor | U LOCK INC. a/k/a U-Lock Inc. | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**13. Each petitioner's claim**

| Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|
| Shanni Snyder | unpaid wages + liq damage | $ 262,000 |
| | retaliation under FLSA | $ 100,000 |
| | interest | 13,100 |
| Single creditor case. | | $ |
| | Total of petitioners' claims | $ 375,100 |

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.

**Part 4:    Request for Relief**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

**Petitioners or Petitioners' Representative**                                       **Attorneys**

**Name and mailing address of petitioner**

| Shanni Snyder | | |
|---|---|---|
| Name | | |

| 14140 US Route 30 | | |
|---|---|---|
| Number    Street | | |

| North Huntingdon | PA | 15642 |
|---|---|---|
| City | State | ZIP Code |

**Name and mailing address of petitioner's representative, if any**

Name

Number    Street

City    State    ZIP Code

Printed name

Firm name, if any

Number    Street

City    State    ZIP Code

Contact phone                Email

Bar number

State

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____        05/03/2022
         MM / DD / YYYY

**✗** _____
Signature of petitioner or representative, including representative's title

**✗** _____
Signature of attorney

Date signed _____
         MM / DD / YYYY

MAY 0 9 2022

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuse may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020; All rights reserved.

RETURN ENVELOPE
POSTAGE REQUIRED

**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL®**

**RECEIVED**
MAY 0 9 2022
CLERK, U.S. BANKRUPTCY COURT
WESTERN DIST OF PA

CLEARED X-RAY SCREENING

P  **PRIORITY MAIL 1-DAY™**

U.S. POSTAGE PAID
Mailed from 15642

usps.com
$8.95
US POSTAGE
Flat Rate Env
05/03/2022

9405 5036 9930 0239 3978 71 0089 5000 0011 5219

Expected Delivery Date: 05/04/22

0023

C094

S. S. S.
14390 ROUTE 30
N HUNTINGDON PA 15642-1050

SHIP    CLERK US BANKRUPTCY COURT
TO:  U.S. BANKRUPTCY COURT. 5414 U.S. STEEL TOWER.
     600 GRANT ST
     5414 US STEEL TOWER
     PITTSBURGH PA 15219-2702

USPS TRACKING #

9405 5036 9930 0239 3978 71

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

TRACKED ■ INSURED

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

EP14F May 2020
OD: 12 1/2 x 9 1/2

PS00001000014

Delivery date specified for domestic use.

Domestic shipments include up to $50 of insurance (restrictions apply).*

Tracking® included for domestic and many international destinations.

Limited international insurance.**

When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.

**See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.



# EXHIBIT 2

FILED
2/29/24 2:58 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Case No. 22-20823-GLT |
| | : | Chapter 7 |
| **U LOCK, INC.,** | : | |
| | : | |
| *Debtor.* | : | Related to Dkt. Nos. 340, 357, 368, 450, 454 |
| | : | |

Robert S. Bernstein, Esq.       David L. Fuchs, Esq.
Stuart C. Gaul, Jr., Esq.       Fuchs Law Office, LLC
Daniel McArdle Booker, Esq.       Carnegie, PA
Sarah E. Wenrich, Esq.
Lara S. Martin, Esq.       John P. Lacher
Bernstein Berkley, P.C.       The Lynch Law Group LLC
Pittsburgh, PA       Cranberry Township, PA
*Attorneys for Christine Biros*       *Attorneys for Shanni Snyder*

## <u>MEMORANDUM OPINION</u>

In ten years, the Court has never held a stronger conviction that a fraud was perpetrated upon the court as it is following an evidentiary hearing on Shanni Snyder's claim.[1] Ms. Snyder obtained a default judgment under the Fair Labor Standards Act ("FLSA")[2] by swearing that debtor U Lock, Inc. employed her to monitor security cameras for ten hours a day, every day, for four years without paying wages.[3] *She lied.* First to the federal district court who awarded the judgment, and then to this Court by commencing an involuntary petition against U Lock based on a fraudulent claim. Ms. Snyder did so to frustrate creditor Christine Biros' efforts to gain control of U Lock's business premises ("Property"), which was awarded to Ms. Biros by

---

[1]      <u>See</u> *Objection to Claim Number 1 Filed by Shanni Snyder*, Dkt. No. 340; *Response to Objection to Claim Number 1 Filed [sic] Shanni Snyder*, Dkt. No. 357.

[2]      <u>See</u> 29 U.S.C. § 201, *et seq.*

[3]      <u>See</u> *Exhibit 7; Exhibit 8* at 5:1-24. With two exceptions, all page numbers refer to the exhibit's Bates-stamp digits. Because *Exhibit 8* and *Exhibit 16* are transcripts, the Court used their internal page numbering in its citations. The difference is apparent from the citation.

final state court orders.[4]  As explained below, the Court will disallow Ms. Snyder's claim in its

entirety and initiate sanction proceedings against her to address this profound abuse.

## I.    BACKGROUND

The validity of Ms. Snyder's claim implicates far more than whether U Lock

owes her money.[5]  As the sole petitioning creditor, and ostensibly the only significant claimant

other than Ms. Biros, Ms. Snyder precipitated this bankruptcy filing and the acrimonious

litigation that followed.  The apparent goal was not U Lock's orderly liquidation, but to continue

the bitter years-long legal battle over the fate of the Property.  This is the prism through which

the one-sided testimony must be viewed.  Accordingly, the Court will appropriately frame this

dispute in the context of the feud between the Snyder family and Ms. Biros.[6]

### A.    U Lock's Genesis and Prelude to Bankruptcy

The Property is essentially a junkyard located on Route 30 in North Huntingdon,

Pennsylvania containing a run-down self-storage building.[7]  In 2015, Ms. Snyder's brothers,

Kash and George,[8] formed U Lock to acquire the Property in hopes of increasing its value

through commercial development.[9]  Ms. Biros loaned the funds to purchase the Property.[10]

---

[4]      See Biros v. U Lock Inc., 2021 PA Super 104, 255 A.3d 489, 493 (2021), re-argument denied (July 28, 2021), appeal denied, 271 A.3d 875 (Pa. 2022).

[5]      For readability, the Court will forgo the tediousness of referring to it as the "alleged" or "purported" claim.

[6]      To the extent not otherwise in the record, the salient background facts are largely judicially established and a matter of public record appropriate for judicial notice.  See Fed. R. Evid. 201(b)(2).

[7]      In re U Lock, Inc., No. 22-20823-GLT, 2023 WL 308210, at *1 (Bankr. W.D. Pa. Jan. 17, 2023) ("The Property is essentially a junkyard on Route 30, littered with construction debris, scrap piles, tire mounds, collapsed trailers, and inoperable vehicles. It contains two structures: a large, free-standing garage/warehouse and a rundown, single-story self-storage building. The Property is also subject to environmental contamination and was the site of a literal garbage fire post-petition.").

[8]      Pretrial Statement/Stipulation, Dkt. No. 454 at ¶ 6(3).  With two Mr. Snyders involved in this case, clarity requires the Court to identify them by their first names.  No disrespect is intended.

[9]      See Exhibit 16 at 96:2-14, 97:9-16.

[10]     Biros v. U Lock Inc., 255 A.3d at 492.

Everyone agrees that the Property is worth at least two to three times more today than its 2015 purchase price of $325,316.[11]

The Snyders have repeatedly alleged that Ms. Biros and her brother John were also silent, controlling partners in U Lock.[12] The Biroses have denied control, though not their involvement. George once testified that Ms. Biros was to fund the development of the Property,[13] but that the project was in a "holding pattern" while the Biroses were under indictment.[14] Whatever the original intent, relations between the Snyders and the Biroses eventually soured and, as a cause or consequence, the Property was not developed. As a result, U Lock only ever used the Property as a self-storage facility to generate minimal revenue.[15] The statement of financial affairs reflects prepetition gross revenue ranging from $8,400 to $13,200 in the previous three years,[16] which George testified was consistent with prior operations as well.[17]

In 2017, Ms. Biros sued U Lock in the Court of Common Pleas of Westmoreland County ("Trial Court"), asserting that U Lock repaid no portion of the loan.[18] In August 2019, the Trial Court found the only equitable solution was to impose a constructive trust on the

---

[11]    See, e.g., Snyder v. Biros (In re U Lock, Inc.), 652 B.R. 456, 462 (Bankr. W.D. Pa. 2023) (Ms. Snyder asserting that Ms. Biros valued the Property between $700,000 and $900,000); In re U Lock, Inc., 2023 WL 308210, at *1 (Debtor estimating the value of the Property in 2022 as $1.9 million).

[12]    See, e.g., Biros v. U Lock Inc., 255 A.3d at 492 ("George Snyder believed [Ms. Biros] and John Biros would be partners in the business venture"); *Exhibit 16* at 14:6-15:2; 17:10-13; 23:3-24:11; 25:5-8; 30:16-32:7; 97:17-20; 100:1-6; *Amended Adversary Complaint*, Adv. Pro. No. 23-2020-GLT, Dkt. No. 17 at ¶¶ 25-27, 34-39, 71-74, 80-83.

[13]    *Exhibit 16* at 74:8-21, 96:2-14, 97:9-16.

[14]    Id. at 17:10-18, 31:24-32:8.

[15]    In re U Lock, Inc., 2023 WL 308210, at *1.

[16]    *Statement of Financial Affairs For Non-Individuals Filing for Bankruptcy*, Dkt. No. 65 at 1.

[17]    *Exhibit 16* at 16:8-24.

[18]    Biros v. U Lock Inc., 255 A.3d at 492.

3

Property in favor of Ms. Biros.[19]  The Superior Court of Pennsylvania affirmed in May 2021,[20] and the Supreme Court of Pennsylvania denied leave to appeal January 2022.[21]  Days later, Ms. Biros recorded deeds purporting to convey legal title to the Property.[22]  But for an appeal regarding the release of those deeds, U Lock was poised to lose possession of the Property.[23]

Ms. Snyder was aware of Ms. Biros' suit and attended at least one proceeding in the Trial Court.[24]  She denied having any involvement with U Lock's defense.[25]

B.   Ms. Snyder's Bankruptcy and Wage Claim Litigation

While Ms. Biros pursued collection from U Lock, Ms. Snyder was engaged with legal proceedings of her own.  First, Ms. Snyder was involved in a child custody matter in March 2018.  This is relevant only because she declared under the penalty of perjury that she was unemployed at the time.[26]

Less than two months later, in May 2018, Ms. Snyder filed her own chapter 7 case pro se.[27]  On Schedule I, she again stated that she was "not employed."[28]  On Schedule A/B, Ms. Snyder answered "no" when asked whether someone owed her amounts for "[u]npaid wages."[29] She twice declared under the penalty of perjury that the information contained within her petition

---

[19]   Id.

[20]   Id. at 497.

[21]   Biros v. U Lock Inc., 271 A.3d 875 (Pa. 2022).

[22]   See In re U Lock, Inc., 652 B.R. at 461.  As explained in the Court's prior Memorandum Opinion, there appears to be a break in the chain of title because Ms. Biros' deeds are from the original sellers rather than U Lock.  Id. at 466.

[23]   Id. at 462.

[24]   Transcript of July 14, 2023 Evidentiary Hearing, Dkt. No. 488 at 65:18-66:7, 66:21-67:8.

[25]   Id. at 66:12-67:8

[26]   Exhibit 1 at BIROS_000001-02.

[27]   See In re Shanni Sue Snyder, Case No. 18-21983-CMB; Exhibit 2.

[28]   Exhibit 2 at BIROS_000050.

[29]   Exhibit 2 at BIROS_000023.

and schedules was "true and correct."[30]  Ms. Snyder subsequently filed another declaration

stating that she "did not have any payment advices from an employer because [she] was not

employed during 2016, 2017, or 2018."[31]  There appearing to be no assets available for

distribution, she received a discharge and the case was closed in 2019.[32]

In July 2021, about two months after the Superior Court affirmed the Trial Court,

Ms. Snyder sued U Lock for unpaid wages under the FLSA.[33]  She prepared and filed the

complaint herself using a form available online.[34]  Despite Ms. Snyder's 2018 declarations, she

now alleged that U Lock employed her from "January 1, 2016, through February 15, 2020" to

"monitor[] video surveillance and cameras from 5 p.m. until 3 a.m. each day."[35]  She claimed

that she was to be paid $7.25 per hour on a monthly basis, but U Lock "continually asked that

[compensation] be deferred until" the Property could be mortgaged.[36]  In sum, she demanded

judgment for $131,351, consisting of $108,079 for hourly wages and $23,272 for overtime.[37]

When U Lock did not respond to the complaint, Ms. Snyder moved for a default

judgment.[38]  The United States District Court for the Western District of Pennsylvania ("District

Court") conducted a hearing on October 18, 2021.[39]  The hearing lasted five minutes and only

---

[30]  Id. at BIROS_000011, BIROS_000016.

[31]  *Exhibit 3* at BIROS_000082.

[32]  See *In re Shanni Sue Snyder*, Case No. 18-21983-CMB, Dkt. Nos. 36, 38, 39.

[33]  *Exhibit 7*.  Apparently, Ms. Snyder filed her complaint only days before the Superior Court denied U Lock's motion for a rehearing.  See Biros v. U Lock Inc., 255 A.3d at 489, re-argument denied (July 28, 2021).

[34]  See *Pro Se 8 (Effective 12/1/2016) Complaint for Violation of Fair Labor Standards*, https://www.uscourts.gov/forms/pro-se-forms/complaint-violations-fair-labor-standards

[35]  *Exhibit 7* at BIROS_000202.

[36]  Id.

[37]  Id. at BIROS_000203.

[38]  *Exhibit D*.

[39]  See *Exhibit E*; *Exhibit 8*.

Ms. Snyder attended.[40]  Before entering judgment, the District Court asked her to confirm under

oath that her factual allegations were true and that she had no other witnesses or evidence.[41]  Ms.

Snyder testified that she "worked for U Lock" and calculated her claim based on "70 hours a

week, 30 being overtime at minimum wage."[42]  She did not reveal that U Lock was owned by

her brothers, nor that her wage claim partially belonged to her bankruptcy estate.  Based on her

representations, the District Court entered judgment against U Lock in the amount of $262,702,

doubling the amount she requested with an award of liquidated damages.[43]

Still acting *pro se*, Ms. Snyder transferred her judgment to the Trial Court in

December 2021 and took no further action until March 2022.[44]  Then she filed a *Praecipe for a*

*Writ of Summons in Equity and Assumpsit and for Lis Pendens* in the Trial Court, requesting that

the Westmoreland County Prothonotary index a lis pendens against the Property.[45]  Notably, Ms.

Snyder named U Lock, Ms. Biros, the seller-estates, the Trial Court judge, the Westmoreland

County Recorder of Deeds, and the Attorney General as defendants.[46]

C.    U Lock's Chapter 7

On April 27, 2022, Ms. Snyder filed an involuntary chapter 7 petition against U

Lock.[47]  Curiously, she initially listed her claim as $375,100 on the involuntary petition before

filing a proof of claim in the amount of $263,100 a month later.[48]  U Lock did not oppose the

---

[40]    *Exhibit 8.*

[41]    Id. at 4:17-6:2.

[42]    Id. at 5:16-23.

[43]    Id. at 6:3-8:9; see *Exhibit G.*

[44]    *Exhibit A* at JPL000005.

[45]    *Exhibit 9.*

[46]    Id.

[47]    *Pretrial Statement/Stipulation*, Dkt. No. 454 at ¶ 6(1).

[48]    Compare *Involuntary Petition Against a Non-Individual*, Dkt. No. 1 at 3, with *Claim 1-1* at 2.  Ms. Snyder
       initially asserted that her claim was secured, but later stipulated that the judgment "is not secured in the

petition and, in fact, repeatedly signaled a desire to use bankruptcy relief to recover the Property

from Ms. Biros.[49]   An order for relief entered in June 2022.[50]

      During the gap period, the Trial Court ordered the Prothonotary to issue a writ of

possession in favor of Ms. Biros.[51]  Ms. Snyder appealed, asserting a judgment lien against the

Property.[52]  The Court subsequently held that the Trial Court's order was void as having entered

in violation of the automatic stay.[53]  The Court suspects that the filing of the involuntary petition

shortly before the Trial Court's order was not a coincidence.

      Without recounting every senseless moment of this case, all matters have been

unreasonably contentious.[54]  This seems a function of both the parties' personal animosity and

their incompatible perspectives regarding the Property.  For her part, Ms. Snyder asserts that Ms.

Biros manipulated the legal system to fraudulently acquire the Property.[55]  Meanwhile, Ms. Biros

argued at every turn that Ms. Snyder's actions are a scheme to contrive a right to the Property

and impede her ownership and possession.[56]  Even so, Ms. Biros did not file a claim objection

---

tangible and intangible assets of U Lock." *Stipulation Between Chapter 7 Trustee, Charles O. Zebley, Jr., Chapter 7 Trustee Robert H. Slone, and Chapter 7 Debtor, Shanni Sue Snyder*, Dkt. No. 228 at ¶ 30.

[49]   See *Exhibit 16* at 8:8-9:16; *Transcript of August 9, 2022 Hearing*, Dkt. No. 115 at 13:2-9, 14:13-15:14.

[50]   See *Order for Relief Under Chapter 7*, Dkt. No. 42.

[51]   See *Exhibit 12*; *Exhibit 13*.

[52]   Id.

[53]   See *Order*, Dkt. No. 143.

[54]   For example, nearly every exhibit offered in support or opposition to Ms. Snyder's claim was subject to an objection despite the overlap between the parties' exhibit lists and the fact that the documents in question were court records.  See *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 6:7-10:22.

[55]   See In re U Lock, Inc., 652 B.R. at 464-465; see also *Brief in Opposition to Motion to Dismiss Amended Adversary Complaint*, Adv. Pro. No. 23-2020-GLT, Dkt. No. 29.

[56]   See *Pretrial Statement/Stipulation*, Dkt. No. 454 at ¶ 3; *Post-Trial Brief in Support of Christine Biros' Objection to Shanni Snyder's Proof of Claim*, Dkt. No. 498 at 2.

for over a year.  The effect of this perpetual fighting is that it has driven the estate into

administrative insolvency.[57]

Matters started coming to a head in December 2022.  To end persistent challenges

to her standing, Ms. Snyder reopened her 2018 bankruptcy and settled her estate's interest in the

wage claim with her chapter 7 trustee.[58]  Then, after a frustratingly protracted sale process, she

outbid Ms. Biros in a sale of U Lock's tangible and intangible assets.[59]  Ms. Snyder's motivation

was to acquire the estate's right to bring a speculative avoidance action against Ms. Biros to

recover the Property.[60]

In February 2023, Ms. Snyder commenced her avoidance action and Ms. Biros

moved to dismiss.[61]  Ultimately, the Court dismissed the complaint with prejudice, concluding

that the Trial Court's imposition of the constructive trust meant that there was no avoidable

"transfer of an interest of the debtor."[62]  Ms. Snyder promptly appealed and the District Court

affirmed.[63]

Around the same time Ms. Snyder filed her adversary proceeding, Ms. Biros

finally objected to Ms. Snyder's claim.[64]  She primarily argued that it was incredible given the

"exorbitant number of hours" Ms. Snyder allegedly worked and emphasized that George and

---

[57]     See *Status Report*, Dkt. No. 477 at ¶¶ 1-3.

[58]     See *Stipulation Between Chapter 7 Trustee, Charles O. Zebley, Jr., Chapter 7 Trustee Robert H. Slone, and Chapter 7 Debtor, Shanni Sue Snyder*, Dkt. No. 228 at ¶ 24.  Essentially, the parties stipulated that Ms. Snyder would have standing to pursue all claims and objections against U Lock and her estate would receive the first $32,500 of any recovery to pay her unsecured creditors.  Id. at ¶ 24(a).

[59]     In re U Lock, Inc., 2023 WL 308210, at *2.  Prior to the initial sale hearing, many of the tangible assets disappeared from the Property, prompting an investigation.  For present purposes, suffice it to say that the assets were found and the propriety of their removal is the subject of a forthcoming decision.

[60]     See In re U Lock, Inc., 652 B.R. at 459.

[61]     Id. at 458.

[62]     Id. at 466-469.

[63]     See Snyder v. U Lock, Inc., 2:23-cv-1410-AJS, 2024 WL 69628 (W.D. Pa. Jan. 5, 2024).

[64]     *Objection to Claim Number 1 Filed by Shanni Snyder*, Dkt. No. 340.

Kash testified that U Lock had no employees.[65]  In response, Ms. Snyder accused Ms. Biros of collaterally attacking the propriety of a final judgment, which she insisted should be resolved by the District Court who entered it.[66]  Ms. Snyder also revealed that Ms. Biros launched a simultaneous challenge to the judgment through a "RICO"[67] action against her and her brothers in the District Court.[68]  After a preliminary hearing in April 2023, the Court found that Ms. Snyder's default judgment was not entitled to preclusive effect and scheduled an evidentiary hearing.[69]

Ms. Snyder sought withdrawal of the reference prior to the evidentiary hearing,[70] but the District Court has yet to take any action on her motion.[71]  As such, matters proceeded before this Court as scheduled.  Following the evidentiary hearing, the parties submitted additional briefing and the Court took the matter under advisement.[72]

## D.     The Evidentiary Record

Three witnesses testified at the evidentiary hearing: Ms. Snyder, George Snyder, and Kash Snyder.  As explained below, none of them testified credibly in support of Ms. Snyder's claim.  Frankly, all that was offered was an implausible, self-serving narrative littered with discrepancies and contradicted by prior sworn statements.

---

[65]     Id. at ¶¶ 26-37, 49-52, 60.

[66]     *Response to Objection to Claim Number 1 Filed by Shanni Snyder*, Dkt. No. 357 at ¶¶ 11-15.

[67]     See Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

[68]     See Biros v. Snyder, 2:23-cv-297-RJC.

[69]     *Transcript of April 13, 2023 Hearing*, Dkt. No. 377 at 12:20-14:9 (citing O'Neal Steel, Inc. v. Chatkin (In re Chatkin), 465 B.R. 54, 65 (Bankr. W.D. Pa. 2012)); *Order of Court*, Dkt. No. 368.

[70]     See *Motion to Withdraw Reference Pursuant to 28 USC 157(d) and Fed. R. Bk. Proc. 5011(a) as to the Objection to Claim Number 1*, Dkt. No. 389; *Response in Opposition to Motion to Withdraw Reference*, Dkt. No. 403.

[71]     See Snyder v. U Lock, Inc., 2:23-cv-979-RJC.

[72]     See *Post-Hearing Brief Regarding Shanni Snyder Claim and the Objection Thereto*, Dkt. No. 497; *Post-Trial Brief in Support of Christine Biros' Objection to Shanni Snyder's Proof of Claim*, Dkt. No. 498.

Generally, Ms. Snyder projected confidence on direct examination, appearing relaxed and speaking clearly, but her testimony was consciously abridged to limit the scope of cross-examination. When pressed about inconsistencies, her demeanor became evasive and the volume of her voice dropped as she began to shift and rock in her seat. Other times Ms. Snyder appeared defiant, self-assured that no matter how dubious, no one could disprove anything she said. In sum, while her testimony never strayed far from her concise direct responses, the frequent lack of elaboration left confusing (if not pregnant) gaps which undermined her story.

Ms. Snyder testified that she worked for U Lock from January 1, 2016 to February 15, 2020[73] monitoring an "independent dropcam of the premises"[74] every night from 5 p.m. to 3 a.m.[75] She explained that she did not typically watch a camera the entire time, but instead checked them on her iPhone when she received motion-activated push notifications.[76] If something unusual appeared, such as an unfamiliar vehicle or loitering kids, Ms. Snyder would call George.[77] In four years, she never made a report to law enforcement.[78] No testimony was offered or elicited to demonstrate the value or necessity of such surveillance, or why it ended at 3 a.m.

Although Ms. Snyder repeatedly insisted that she "dedicated" certain hours to monitoring the Property,[79] her full testimony betrays that as an overstatement. Indeed, she acknowledged that during her "work hours" she regularly cared for her three young children

---

[73] *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 15:2-3, 33:11-18, 35:5-9.

[74] Id. at 15:6-7.

[75] Id. at 15:22-24.

[76] Id. at 15:8-16:2.

[77] Id. at 16:11-17:5. Ms. Snyder noted that John Biros and his father would "show up at night and just walk around" but that "it was okay they were there." Id. at 17:2-11.

[78] Id. at 81:4-12.

[79] Id. at 15:22-16:10, 18:1-6, 36:11-15.

without assistance, cooked, slept, and went to social gatherings.[80]  Ms. Snyder also claims to

have never taken a vacation day, a sick day, or any other time off from her duties over a span of

roughly 1,500 days.[81]  Even a hospitalization for the birth of her twins could not sideline her

because she always had her iPhone available.[82]  At best, she described a sort of "on-call"

arrangement with no indication as to how much time was spent curating push notifications for

George.

There is no written agreement or writing of any kind evidencing U Lock's

employment of Ms. Snyder.[83]  Nor was there testimony revealing how and why she began

monitoring U Lock's Property.  Still, Ms. Snyder expected to be paid for this work.[84]  She

testified that George "promised to pay when things got straightened out, if he got a mortgage on

the place, if the property were developed."[85]  Despite this vague understanding, Ms. Snyder

expected "[a]t least minimum wage, but [George] at one point said he would give [her] more."[86]

Ultimately, U Lock never paid Ms. Snyder anything.[87]  Though she never made a

written demand for payment,[88] Ms. Snyder testified that she and George repeatedly argued about

the lack of pay and that she kept getting the "runaround."[89]  But according to Ms. Snyder, she

continued to work for years without payment because she hoped her brother "would square up

---

[80]  Id. at 16:3-10, 17:17-18:6, 78:9-24.

[81]  Id. at 35:21-36:12.

[82]  Id.

[83]  Id. at 64:17-20, 79:19-80:25, 82:6-9

[84]  Id. at 79:19-80:25.

[85]  Id. at 18:16-19:4, 37:23-25.

[86]  Id. at 19:5-7, 41:9-12, 45:23-25.

[87]  Id. at 18:11-12, 23:22-23, 38:3-6, 52:18-22

[88]  Id. at 80:17-21.

[89]  Id. at 19:9-13.

with [her] when the time came."[90]  By 2020, however, she no longer believed she would be paid and ceased working for U Lock.[91]

Much of Ms. Snyder's cross-examination focused on her sworn declarations that she was neither employed nor owed unpaid wages.  She conceded that they were signed under the penalty of perjury at a time when she claims that she monitored U Lock's Property and was owed about $50,000.[92]  When asked to reconcile this disjoint, Ms. Snyder's response devolved into hair splitting between "working" and being "employed."  Basically, she says she never viewed U Lock as her employer because she was not paid for her work.[93]  U Lock was not a job but "a favor with a promise to be paid."[94]  And Ms. Snyder similarly justified the omission of any unpaid wages from her schedules because she had not received income and was unaware that she could collect from U Lock.[95]  She testified that she only learned she could sue U Lock when the Department of Labor came to her home and "said there's no favors, there's no bartering, there's no sisterly love, . . . they should have paid me the $7.25."[96]  Unsurprisingly, no context was given for the alleged house call by the Department of Labor.

As to the wage claim litigation in the District Court, Ms. Snyder denied coordinating with either George or U Lock.[97]  She also testified that she did not know why U Lock neither appeared nor responded to her complaint.[98]  And given that Ms. Snyder admitted

---

[90]     Id. at 47:6-10, 53:2-3.

[91]     Id. at 19:14-20.

[92]     Id. at 48:6-20, 51:10-11, 52:9-25.

[93]     Id. at 41:2-8, 45:16-22, 46:4-8, 46:23-47:1, 62:17-19, 63:19-64:5.

[94]     Id. at 61:13-19.

[95]     Id. at 23:10-13, 23:25-24:1, 46:7-8, 51:20-52:8, 54:10-24, 56:3-17, 57:18-58:14, 59:2-7, 60:10-17.

[96]     Id. at 45:16-22, 52:6-8, 64:2-5.

[97]     Id. at 21:13-18.

[98]     Id. at 21:19-25.

that the promised compensation was always to be deferred, she could not explain why she alleged U Lock was supposed to pay her monthly.[99]

       While Ms. Snyder is neither a lawyer nor has legal training, she concedes that she has become fairly adept at litigation from "be[ing] in Court for the last 15 years."[100]  In that vein, she testified that she prepared and filed the *Praecipe for a Writ of Summons in Equity and Assumpsit and for Lis Pendens* without assistance of counsel.[101]  Though it might have been illuminating to probe Ms. Snyder's understanding of a lis pendens and why she requested one, that did not happen.  But despite naming Ms. Biros, the seller-estates, the Trial Court judge, the Recorder of Deeds, and the Attorney General as defendants, she could only offer that she sued U Lock because that was who owed her money.[102]  Similarly incongruous, Ms. Snyder purports to be unsure whether Ms. Biros prevailed in her litigation against U Lock,[103] but still filed a notice of appeal in the Trial Court as a non-party appellant.[104]  She also asserts that it is purely coincidental that it was timestamped two minutes before U Lock's notice of bankruptcy and does not suggest any coordination with its counsel.[105]

       Finally, in a bizarre and telling admission, Ms. Snyder testified that it is unimportant to her whether U Lock has assets to pay her claim so long as she has one.[106]  She did not explain why, leaving the Court to wonder if she inadvertently said the quiet part out loud.

---

[99]  Id. at 36:18-37:11.

[100]  Id. at 71:3-7.

[101]  Id. at 70:18-71:2; see *Exhibit 9*.

[102]  *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 71:12-20.

[103]  Id. at 68:15-69:19.

[104]  See *Exhibit 13.*

[105]  *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 74:11-75:24; Compare *Exhibit 13* with *Exhibit 14*.

[106]  *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 59:10-60:5.

For his part, George provided only half-hearted corroboration of the basic premise of Ms. Snyder's claim. Before delving into his testimony, the Court must stress that it has observed George both on and off the witness stand many times during the pendency of U Lock's case. In the past, the Court has often (though not always) found him to be the most credible party involved with a calm, forthright demeanor. *But this was a different George.* From the minute he took the witness stand, George awkwardly clutched the back rail as if holding on for dear life. He was visibly nervous and flushed, constantly shifting in his seat. It seemed George was testifying against his will.

The Court presumes that George's apparent discomfort stemmed from the fact that he already testified many times here and in the Trial Court that U Lock did not have employees.[107] Much like his sister, George suggested that any perceived inconsistency was a matter of semantics.[108] He testified that U Lock had several dozen "workers" helping throughout the years, but would not call them "employees" because there were no formal employment documents or payroll associated with them.[109] In fact, George did not necessarily know their last names or have their phone numbers.[110] Still, he insisted that no one worked more than "a few hours a year"[111] and were paid no more than $500 or $600.[112]

As to Ms. Snyder, George conceded that she "watched the cameras" for the years stated.[113] When asked if he expected to pay her for that work, he answered: "In some way,

---

[107] Id. at 95:17-21, 97:23-100:7.

[108] Id. at 96:18-97:15.

[109] Id. at 86:21-87:8, 95:17-100:7.

[110] Id. at 97:1-14.

[111] Id. at 95:22-96:4, 87:2-8.

[112] *Exhibit 16* at 26:20-24.

[113] *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 86:14-15.

shape, or form. . . . I was eventually planning on paying everybody."[114]  George did not elaborate

further, but previously offered a more robust response at the meeting of creditors:

> Shanni, you know, we didn't really consider her an employee.
> She's my sister, and I thought it was more of a favor and the
> understanding was when we developed the property, she would get
> something. . . . I think my brother might have said that he thought
> it was sisterly love."[115]

He described their "agreement" as "[j]ust that she would get something when . . . we got . . .

everything off the ground."[116]

The meeting of creditors' transcripts revealed an intriguing detail not explored

during the evidentiary hearing: Ms. Snyder provided her own camera system. George explained

that the closed-circuit system he controlled was not remotely accessible, so she supplied her

own.[117]  Yet he also testified that the Property lacked internet service at the time.[118]  As a result,

he was unsure how Ms. Snyder accessed the cameras from her iPhone.[119]  He mused that she

might have tapped into someone else's Wi-Fi.[120]

Turning to the wage claim litigation, George admitted that he was aware of Ms.

Snyder's complaint, but denied colluding with her to establish a claim against U Lock.[121]  He

testified that U Lock did not respond to the complaint because U Lock's counsel informed him

that defending a labor claim would cost over $10,000.[122]  Surprisingly, George did not inform

---

[114]     Id. at 86:16-20.

[115]     *Exhibit 16* at 64:21-65:4, 105:6-12.

[116]     Id. at 21:17-21 (stammering omitted).

[117]     Id. at 79:21-81:16.

[118]     Id. at 80:22-81:2.

[119]     Id. at 79:10-22.

[120]     Id.

[121]     *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 87:10-18.

[122]     Id. at 87:19-24.

counsel that it was Ms. Snyder who commenced the suit.[123]   Because U Lock lacked

resources,[124] he reasoned that "if something fell through with the court case and everything with

Biros that then there would be no money to pay, so it was kind of a moot point."[125]   At the

meeting of creditors, George put it bluntly: "we kind of thought she'd go away."[126]   And even

though he did not consider Ms. Snyder an employee of U Lock,[127] he purportedly has "no

position" as to whether she was truthful with the District Court.[128]

       Kash Snyder testified last.   It did not go well.   The most remarkable moment

involved an extended back and forth over whether he remembered testifying minutes earlier that

he has trouble remembering.[129]   From the start, Kash claimed to be unaware that he was

identified as a principal of U Lock.[130]   He then shockingly stated that he had no recollection of

Ms. Biros suing U Lock in 2017 before conceding there was a lawsuit over the Property.[131]   Nor

did he recall testifying under oath in the Trial Court during that case.[132]   In fact, the only thing

Kash appeared to remember clearly was that Ms. Snyder was performing "camera work" for U

Lock, of which he "had limited knowledge."[133]   Needless to say, his testimony was neither

credible nor useful.

---

[123]    Id. at 87:24-25.

[124]    *Exhibit 16* at 20:20-21:10, 21:21-24.

[125]    *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 88:1-7.

[126]    *Exhibit 16* at 21:7-10, 47:5-49:5

[127]    Id. at 20:20-21:10.

[128]    Id. at 27:23-28:16.

[129]    *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 108:10-25.   To be clear, there was no
suggestion that Kash's memory lapses resulted from a diagnosed condition.

[130]    Id. at 103:2-4.

[131]    Id. at 104:1-14, 104:24-105:9.

[132]    Id. at 106:3-9.

[133]    Id. at 108:3-6.

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States District Court for the Western District of Pennsylvania on October 16, 1984.  This is clearly a core proceeding under 28 U.S.C. § 157(b)(2)(B) as it pertains to the "allowance or disallowance of claims against the estate."

Nevertheless, Ms. Snyder disputes the Court's jurisdiction.[134]  She theorizes that withdrawal of the reference is mandatory because resolution of the contested matter requires "consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."[135]  Practically, Ms. Snyder is not so much denying this Court's jurisdiction as she is hoping it will evaporate upon a future event.[136]  As it stands, unless the reference is withdrawn, the Court is duty-bound to exercise the jurisdiction it has been granted by the Order of Reference.

## III.    DISCUSSION

### A.    Threshold Issues

At the preliminary hearing on the claim objection, the Court ruled on the applicability of both collateral and judicial estoppel.  Given that Ms. Snyder continues to argue that the facts underlying her judgment cannot be relitigated, as well as the likelihood of an appeal, it is worthwhile to reiterate those findings now.

---

[134]    See *Respondent Shanni Snyder's Portion of the Pretrial Statement/Stipulation*, Dkt. No. 450 at ¶ 2; *Brief Regarding Bankruptcy Court Jurisdiction Over Contested Matter as to the Validity of Shanni Snyder Claim*, Dkt. No. 469.

[135]    28 U.S.C. § 157(d).

[136]    It is telling that Ms. Snyder neither sought expedited consideration from the District Court nor a stay of the evidentiary hearing pending a determination of her motion.

1.    The Preclusive Effect of a Default Judgment

Collateral estoppel prohibits the re-litigation of issues that have been adjudicated in a prior lawsuit.[137]   Although both state and federal courts recognize collateral estoppel principles, the preclusive effect of a federal judgment is determined by federal law.[138]   Under federal law, collateral estoppel bars a party from relitigating an issue when:

> (1) the issue sought to be precluded [is] the same as the one involved in the prior action;
>
> (2) the issue [was] actually litigated;
>
> (3) it [was] determined by a valid and final judgment; and
>
> (4) the determination [was] essential to the prior judgment.[139]

An additional implicit requirement is that "the party against whom [collateral estoppel] is asserted [must be] a party or in privity with a party to the prior adjudication." [140]

Generally, issues raised in a default judgment are not "actually litigated" for purposes of collateral estoppel if the defendant neither appears nor participates.[141]   The United States Court of Appeals for the Third Circuit observed that "invok[ing] the doctrine of collateral estoppel in default causes is not only an oppressive application of the doctrine, but it misconceives the nature of a default judgment."[142]   Indeed, "[a] judgment by default only admits

---

[137]    Wolstein v. Docteroff (In re Docteroff), 133 F.3d 210, 214 (3d Cir. 1997).

[138]    See Doe v. Hesketh, 828 F.3d 159, 171 (3d Cir. 2016); Paramount Aviation Corp. v. Agusta, 178 F.3d 132, 144 (3d Cir. 1999).

[139]    Peloro v. United States, 488 F.3d 163, 175 (3d Cir. 2007); see In re Docteroff, 133 F.3d at 214; Burlington N. R. Co. v. Hyundai Merch. Marine Co., 63 F.3d 1227, 1232 (3d Cir. 1995); In re Ross, 602 F.2d 604, 608 (3d Cir. 1979); In re McMillan, 579 F.2d 289, 291-92 (3d Cir. 1978); Haize v. Hanover Ins. Co., 536 F.2d 576, 579 (3d Cir. 1976).

[140]    Bestwall LLC v. Armstrong World Indus., Inc. (In re Bestwall LLC), 47 F.4th 233, 243 (3d Cir. 2022) (quoting Doe v. Hesketh, 828 F.3d at 171).  It appears this element is often omitted from case law unless it is at issue.

[141]    In re McMillan, 579 F.2d 289, 293 (3d Cir. 1978); see In re Chatkin, 465 B.R. at 65; Consumers Produce Co., Inc. v. Masdea (In re Masdea), 307 B.R. 466, 473 (Bankr. W.D. Pa. 2004).

[142]    In re McMillan, 579 F.2d at 293.

for the purpose of the action the legality of the demand or claim in suit: it does not make the

allegations of the declaration or complaint evidence in an action upon a different claim."[143]  As

explained by the Supreme Court of the United States:

> Various considerations, other than the actual merits, may govern a
> party in bringing forward grounds of recovery or defence [sic] in
> one action, which may not exist in another action upon a different
> demand, such as the smallness of the amount or the value of the
> property in controversy, the difficulty of obtaining the necessary
> evidence, the expense of the litigation, and his own situation at the
> time. A party acting upon considerations like these ought not to be
> precluded from contesting in a subsequent action other demands
> arising out of the same transaction.[144]

Thus, a default judgment is "conclusive in a subsequent suit on the same cause of action

involving the same parties," but does not "preclude the litigation of issues not litigated in the

defaulted action."[145]

There is, however, an exception to the general rule.  Issues may be deemed

"actually litigated" where the defendant "participates extensively" before the default "but

deliberately prevents a resolution of [a lawsuit] and a default judgment is entered . . . as a

sanction."[146]  In such cases, the "actually litigated" element is sometimes articulated as "the

party against whom the bar is asserted had a full and fair opportunity to litigate the issue in

---

[143]    <u>Cromwell v. Sac Cnty.</u>, 94 U.S. 351, 356, 24 L. Ed. 195 (1876).

[144]    <u>Id.</u>  <u>See</u> <u>In re McMillan</u>, 579 F.2d at 293 ("The defendant in a suit should not be compelled, at his peril, to embark on extensive litigation involving perhaps some minor matter 'in order to prevent the operation of a judgment which would be held conclusively to have established against him every material fact alleged and not denied in the declaration, so as to preclude him from showing the truth if another controversy should arise between the same parties.'") (quoting Vol. 1B Moore's Federal Practice P 0.444(2) at 4006-07).

[145]    <u>In re McMillan</u>, 579 F.2d at 293.

[146]    <u>In re Masdea</u>, 307 B.R. at 473 (citing <u>In re Docteroff</u>, 133 F.3d at 215).

question."[147]  But this exception applies only to "atypical" defaults.  Simply put, "a full and fair

opportunity to litigate" does not render "typical" non-appearance defaults "actually litigated."[148]

       Here, it is undisputed that U Lock never appeared, answered, or otherwise

defended against Ms. Snyder's wage claim in the District Court.  As such, her judgment is a

"typical" default judgment.  While the District Court conducted a brief hearing under Fed. R.

Civ. P. 55(b)(2) and Ms. Snyder supplied perfunctory testimony in support of her claim, U

Lock's complete lack of participation is dispositive.  Under these circumstances, proper notice

and "a full and fair opportunity to litigate" do not impact whether issues were "actually

litigated."  Accordingly, Ms. Biros's objection to Ms. Snyder's proof of claim is not barred by

collateral estoppel.

       2.     Applicability of Judicial Estoppel

       Judicial estoppel "generally prevents a party from prevailing . . . on an argument

and then relying on a contradictory argument to prevail in another phase" of litigation or

subsequent case.[149]  The flagrant use of inconsistent positions is "an evil the courts should not

tolerate" and an "affront to judicial dignity,"[150] so the doctrine exists "'to protect the integrity of

---

[147]    See In re Bestwall LLC, 47 F.4th at 243; Doe v. Hesketh, 828 F.3d at 171.

[148]    See In re McMillan, 579 F.2d at 293; In re Chatkin, 465 B.R. at 65; In re Masdea, 307 B.R. at 473.

[149]    Pegram v. Herdrich, 530 U.S. 211, 227, n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000); see Zedner v. United States, 547 U.S. 489, 504, 126 S. Ct. 1976, 1987, 164 L. Ed. 2d 749 (2006); New Hampshire v. Maine, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814, 149 L. Ed. 2d 968 (2001); see also Davis v. Wakelee, 156 U.S. 680, 689, 15 S. Ct. 555, 558, 39 L. Ed. 578 (1895) ("where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.").

[150]    Scarano v. Cent. R. Co. of N. J., 203 F.2d 510, 513 (3d Cir. 1953).

the judicial process.'"[151] Thus, unlike collateral estoppel, judicial estoppel is a sanction targeting a litigant's conduct rather than a doctrine of finality.[152]

Judicial estoppel is largely a matter of discretion.[153] "[T]here is no rigid test"[154] because "'[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle.'"[155] Still, several factors inform a court's decision to apply the doctrine in a particular case. First, a party's later position must be clearly and irreconcilably inconsistent with its earlier position.[156] Next, a court must have accepted the initial position, introducing the risk of inconsistent rulings and the perception that one of the courts was misled.[157] The Third Circuit instructs that the change in position must be adopted in bad faith.[158] The court also should consider whether the inconsistent positions would bestow an unfair advantage to the asserting party or an unfair detriment to the other.[159] Finally, because judicial estoppel is a sanction, it may be applied only if "'tailored to address the harm

---

[151]   New Hampshire v. Maine, 532 U.S. at 749 (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982)).

[152]   Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d 773, 779 (3d Cir. 2001); see Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d 98, 109 (3d Cir. 1999) ("Judicial estoppel is one arrow in the quiver of sanctions at a court's disposal.").

[153]   New Hampshire v. Maine, 532 U.S. at 750.

[154]   G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247, 262 (3d Cir. 2009), as amended (Dec. 4, 2009).

[155]   New Hampshire v. Maine, 532 U.S. at 750 (quoting Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982)).

[156]   Id.; see G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d at 262; Dam Things from Denmark, a/k/a Troll Co. ApS, v. Russ Berrie & Co., Inc., 290 F.3d 548, 559 (3d Cir. 2002).

[157]   New Hampshire v. Maine, 532 U.S. at 750-751; G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d at 262.

[158]   See G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d at 262; Dam Things from Denmark, a/k/a Troll Co. ApS, v. Russ Berrie & Co., Inc., 290 F.3d at 559; Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d at 779.

[159]   New Hampshire v. Maine, 532 U.S. at 751; see United States v. Pelullo, 399 F.3d 197, 223 (3d Cir. 2005), as amended (Mar. 8, 2005).

identified' and no lesser sanction would adequately remedy the damage done by the litigant's misconduct."[160]

Ms. Biros argues that Ms. Snyder should be judicially estopped from asserting a wage claim against U Lock here because she failed to disclose one in her chapter 7 case.[161] Certainly, Ms. Snyder's schedules and declarations that she was neither employed nor owed wages are patently inconsistent with her contemporaneous assertion of a wage claim in the District Court.  And, of course, a discharge without the payment of claims evidences judicial acceptance of Ms. Snyder's representation that she had no non-exempt assets.[162]  Nevertheless, judicial estoppel is an inappropriate sanction under the circumstances.

The wage claim asserted against U Lock is partially an asset of Ms. Snyder's chapter 7 estate and is now subject to an agreement with her trustee.[163]  Their stipulation specifically grants Ms. Snyder the standing to pursue the estate's interest in the wage claim on behalf her creditors.[164]  While the Third Circuit has repeatedly estopped debtors who concealed pending or potential claims,[165] a trustee "'is not tainted or burdened by the debtor's misconduct.'"[166]  Otherwise judicial estoppel punishes the wrong party since "creditors should not be denied the benefit of a cause of action, and potential recovery, due to [a debtor]'s failure

---

[160]    Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d at 779–80 (quoting Klein v. Stahl GMBH & Co. Maschinefabrik, 185 F.3d at 108).

[161]    *Objection to Claim Number 1 Filed by Shanni Snyder*, Dkt. No. 340 at ¶¶ 20-25.

[162]    See *Exhibit 2* at BIROS_000014

[163]    See *Stipulation Between Chapter 7 Trustee, Charles O. Zebley, Jr., Chapter 7 Trustee Robert H. Slone, and Chapter 7 Debtor, Shanni Sue Snyder*, Dkt. No. 228.

[164]    Id. at ¶ 24.

[165]    See Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314 (3d Cir. 2003); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1988).

[166]    Killmeyer v. Oglebay Norton Co., 817 F. Supp. 2d 681, 692 (W.D. Pa. 2011) (quoting Parker v. Wendy's Int'l, Inc., 365 F.3d 1268, 1273 (11th Cir. 2004)); see Riazuddin v. Schindler Elevator Corp. (In re Riazuddin), 363 B.R. 177, 187-88 (B.A.P. 10th Cir. 2007).

to disclose."[167]  Therefore, despite Ms. Snyder's presumed bad faith,[168] she cannot be judicially

estopped from asserting the claim any more than her chapter 7 trustee could be.[169]

      B.    <u>The Claim Objection</u>

      Under section 502(a) of the Bankruptcy Code,[170] a proof of claim "is deemed

allowed, unless a party in interest . . . objects."[171]  The Federal Rules of Bankruptcy Procedure

further provide that "[a] proof of claim executed and filed in accordance with these rules shall

constitute *prima facie* evidence of the validity and amount of the claim."[172]  "In other words, a

claim that alleges facts sufficient to support a legal liability to the claimant satisfies the

claimant's initial obligation to go forward."[173]  Then, "the burden shifts to the objector to

produce sufficient evidence to negate the *prima facie* validity of the filed claim."[174]  The objector

"must produce evidence equal in force to the *prima facie* case" that "would refute at least one of

---

[167]   <u>Killmeyer v. Oglebay Norton Co.</u>, 817 F. Supp. 2d at 692.

[168]   A presumption of bad faith arises when "averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose." <u>Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.</u>, 337 F.3d at 321 (citing <u>Oneida Motor Freight, Inc. v. United Jersey Bank</u>, 848 F.2d 416-18).

[169]   Because the Court finds that Ms. Snyder does not have a claim against U Lock, it need not consider whether she should be judicially estopped from asserting a wage claim beyond her chapter 7 estate's interest.

[170]   Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq.* All references to "Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[171]   11 U.S.C. § 502(a).

[172]   Fed. R. Bankr. P. 3001(f).  Ms. Snyder contends that "[t]he scheduling of a debt constitutes evidence of the validity and amount of the claim," *Post-Hearing Brief Regarding Shanni Snyder Claim and the Objection Thereto*, Dkt. No. 497 at 3, but that is only true in chapter 11 cases.  <u>See</u> 11 U.S.C. 1111(a); Fed. R. Bankr. P. 3003(a)-(b).

[173]   <u>In re Allegheny Int'l., Inc.</u>, 954 F.2d 167, 173 (3d Cir. 1992).

[174]   <u>Payne v. Lampe (In re Lampe)</u>, 665 F.3d 506, 514 (3d Cir. 2011).

the allegations that is essential to claim's legal sufficiency."[175]  If successful, "the burden reverts

to the claimant to prove the validity of the claim by a preponderance of the evidence."[176]

At the start of the evidentiary hearing, the Court concluded that Ms. Snyder's

claim was not presumptively valid on the record before it.[177]  On its face, the wage claim (which

was established solely by a default judgment) clashed with her contemporaneous court-filed

declarations that she was neither employed nor owed wages.  Given this patent contradiction, the

burden shifted to Ms. Snyder to prove the existence of her claim by a preponderance of the

evidence.[178]  The Court finds that she did not carry her burden legally or factually.[179]

1.     Ms. Snyder Has Not Established the FLSA Applies

To start, the Court observes that Ms. Snyder offered only cursory arguments on

the applicability of the FLSA.[180]   This appears to have been driven by her refusal to

acknowledge that such issues were in play as part of a claim objection.[181]  Whatever the reason,

the Court is left with only a superficial theory regarding a deceptively complex area of law.

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime

guarantees that cannot be modified by contract."[182]  In this sense, the FLSA does not "create new

wage liabilities," but merely fixes standards to existing obligations.[183]  And while the FLSA

---

[175]     In re Allegheny Int'l., Inc., 954 F.2d at 173-74.

[176]     Id. at 174.

[177]     *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 11:7-12:7.

[178]     Presumably because Ms. Snyder maintains her judgment is unassailable, she contends that the burden of
proof should not have shifted to her.  *Post-Hearing Brief Regarding Shanni Snyder Claim and the
Objection Thereto*, Dkt. No. 497 at 4.

[179]     For the removal of any doubt, the analysis contained in sections III.B.1 and III.B.2, *infra*, each provide an
independent justification to disallow Ms. Snyder's claim in its entirety.

[180]     See *Post-Hearing Brief Regarding Shanni Snyder Claim and the Objection Thereto*, Dkt. No. 497 at 7-8.

[181]     See section II, *supra*.

[182]     Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 69, 133 S. Ct. 1523, 1527, 185 L. Ed. 2d 636 (2013).

[183]     Bowman v. Pace Co., 119 F.2d 858, 860 (5th Cir. 1941).

covers most workers, it does not reach them all.  To determine the applicability of the minimum

wage provisions requires parsing a web of statutory definitions.

A reasonable starting point is section 206(a) of the FLSA, which provides:

> Every employer shall pay to each of his employees who in any
> workweek is engaged in commerce or in the production of goods
> for commerce, or is employed in an enterprise engaged in
> commerce or in the production of goods for commerce, wages at
> the following rates . . . .[184]

An "employee" is "any individual employed by an employer,"[185] while an "employer" "includes

any person acting directly or indirectly in the interest of an employer in relation to an

employee."[186]  The Third Circuit has recognized that "[t]he FLSA defines employer and

employee broadly and with 'striking breadth.'"[187]  "Employ," in turn, means "to suffer or permit

to work."[188]

Ms. Snyder's argument stops short with these three terms, avoiding a critical

concept: *commerce*.  "Commerce" is defined under the FLSA as "trade, commerce,

transportation, transmission, or communication among the several States or between any State

and any place outside thereof."[189]  Her omission is significant because the constitutional

---

[184]    29 U.S.C. § 206(a).

[185]    29 U.S.C. § 203(e)(1).

[186]    29 U.S.C. § 203(d).

[187]    Burrell v. Staff, 60 F.4th 25, 43 (3d Cir. 2023), cert. denied sub nom. Lackawanna Recycling Ctr., Inc. v. Burrell, 143 S. Ct. 2662, 216 L. Ed. 2d 1239 (2023), (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)).

[188]    29 U.S.C. § 203(g).  For the sake of completeness, "[t]he Supreme Court interprets 'work' broadly as 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the [employer's] benefit.'"  Tyger v. Precision Drilling Corp., 78 F.4th 587, 591 (3d Cir. 2023) (quoting IBP, Inc. v. Alvarez, 546 U.S. 21, 25, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005) (internal quotation marks omitted)).

[189]    29 U.S.C. § 203(b).

authority for the FLSA derives from the Commerce Clause,[190] meaning that interstate commerce is its legislative hook.[191]

Returning to section 206(a) of FLSA, employee coverage can be triggered if either the employee or employer is "engaged in commerce."  Individual coverage applies when employees are themselves "engaged in commerce or in the production of goods for commerce,"[192] but activities that "merely 'affect commerce'" are insufficient.[193]  In contrast, "enterprise"[194] coverage extends to employees "employed in an enterprise engaged in commerce or in the production of goods for commerce."[195]  Because individual coverage focuses on the activities of the employee rather than the business of the employer, it is the narrower alternative.

Although most cases under the FLSA fall within enterprise coverage, notable limitations are relevant here.  For example, to be an "enterprise engaged in commerce," it must have an "annual gross volume of sales made or business done [that] is not less than $500,000."[196]  There is also a so-called "Mom and Pop" exemption applicable to "[a]ny establishment that has as its only regular employees the owner thereof or the parent, spouse, child, or other member of the immediate family of such owner."[197]  The implementing regulations clarify that "other

---

[190]     U.S. Const., Art. I, § 8, cl. 3.

[191]     See Mitchell v. Lublin, McGaughy & Assocs., 358 U.S. 207, 211, 79 S. Ct. 260, 264, 3 L. Ed. 2d 243 (1959); Cruz v. Chesapeake Shipping, Inc., 932 F.2d 218, 225-26 (3d Cir. 1991).

[192]     29 U.S.C. § 206(a).

[193]     Mitchell v. Lublin, McGaughy & Assocs., 358 U.S. at 211.

[194]     Generally, "enterprise" under the FLSA "means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor."  29 U.S.C. § 203(r)(1).

[195]     29 U.S.C. § 206(a).

[196]     29 U.S.C. § 203(s)(1)(A)(ii).

[197]     29 U.S.C. § 203(s)(2); see Donovan v. Sutherland, 530 F. Supp. 748, 749 (E.D. Mich. 1982).

member of the immediate family of such owner" includes relationships such as brothers and sisters.[198]

Ms. Snyder has never articulated a theory of FLSA coverage, but U Lock is plainly not an "enterprise engaged in commerce" under section 206(a).[199]  Putting aside whether U Lock engaged in *interstate* commerce, the record reflects that its gross revenue never reached $14,000, let alone $500,000.   Further, U Lock appears to fall within the "Mom and Pop" exemption because its only regular employees were George, Kash, and (allegedly) Ms. Snyder. Although George testified that "several dozen other people did extensive work for U Lock over the years,"[200] this fails to demonstrate the existence of "regular employees."[201]  His insistence that no one worked more than "a few hours a year"[202] suggests that such "help" was infrequent, irregular, and sporadic.[203]  It seems unlikely these workers "filled roles and functions which were an integral part of the operation of the establishment."[204]  In fact, no one explained what these workers did.

Without enterprise coverage, Ms. Snyder needed to show that her individual activities on behalf of U Lock qualified as being "engaged in [interstate] commerce."[205]  She declined to do so.  As a result, the Court is left to wonder how monitoring push notifications from a junkyard's camera system implicates interstate commerce.  This is particularly true where

---

[198]     29 C.F.R. § 779.234.

[199]     29 U.S.C. § 206(a).

[200]     *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 87:2-8.

[201]     29 U.S.C. § 203(s)(2).

[202]     *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 95:22-96:4.

[203]     See 29 C.F.R. § 779.234 ("The 1966 amendments extended the exception to include family operated establishments which only employ persons other than members of the immediate family infrequently, irregularly, and sporadically.").

[204]     Donovan v. Sutherland, 530 F. Supp. at 750; see Coronado v. Selkirk, No. G88-474CA7, 1989 WL 161165, at *5 (W.D. Mich. June 23, 1989); Donovan v. I & J, Inc., 567 F. Supp. 93, 102 (D.N.M. 1983).

[205]     29 U.S.C. § 206(a).

U Lock's minimal self-storage revenue raises questions as to the scope of its own commercial engagement. Further muddying the waters is the fact U Lock was meant to commercially develop the Property, but undisputedly remained stuck in a "holding pattern."[206] It was incumbent on Ms. Snyder as the claimant to establish these elements through an affirmative showing.

Even if Ms. Snyder could overcome those hurdles, there is another unappreciated complexity to her claim. As examined below, Ms. Snyder testified that her work for U Lock was essentially an on-call arrangement with her primarily responding to iPhone push notifications. Herein lies the rub: time spent on-call is compensable under the FLSA only if the employee was "engaged to wait," and not if they "waited to be engaged."[207] The distinction largely boils down to "whether waiting time is spent predominantly for the benefit of the employer" and "the degree to which the employee is free to engage in personal activities."[208] Because Ms. Snyder testified that she engaged in a multitude of personal activities unimpeded, including child care, socializing, and sleeping,[209] only time spent actively working would be compensable.

For all these reasons, Ms. Snyder failed to prove that the FLSA applied to the services she allegedly performed for U Lock.

2.     Ms. Snyder's Claim is Not Credible

Ms. Snyder declares victory in her post-hearing brief, arguing that Ms. Biros provided no testimony or evidence refuting her claim that she provided services to U Lock

---

[206]    *Exhibit 16* at 17:10-18.

[207]    See Skidmore v. Swift & Co., 323 U.S. 134, 137, 65 S. Ct. 161, 163, 89 L. Ed. 124 (1944).

[208]    Ingram v. Cnty. of Bucks, No. 96-2122, 1997 WL 197299, at *3 (E.D. Pa. Apr. 16, 1997), aff'd, 144 F.3d 265 (3d Cir. 1998) (citing Owens v. Local No. 169, 971 F.2d 347, 350 (9th Cir. 1992), Renfo v. City of Emporia, Kan., 948 F.2d 1529, 1537 (10th Cir. 1991), and Brock v. El Paso Nat. Gas Co., 826 F.2d 369, 372-73 (5th Cir. 1987)).

[209]    *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 16:3-10, 17:17-18:6, 78:9-24.

without payment.[210]  Her assertion grossly mischaracterizes her burden and the record.  Not a scintilla of objective or documentary evidence supports her wage claim, and her own contemporaneous declarations unequivocally deny that she was employed or owed wages.  Ms. Snyder's attempt to weave an unimpeachable narrative within the confines of her and her brothers' prior sworn statements is transparent and strains credulity.  As will be explained, her testimony often omitted salient details, relied on implausible ones, and contradicted the factual predicates of her claim.  The inescapable conclusion is that Ms. Snyder fabricated a possible explanation for her proof of claim to (awkwardly) fit within her false representations to the District Court.

Reviewing the evidentiary record, the Court is struck by the lack of exposition that should have connected Ms. Snyder's assertions into a coherent account.  George and Kash confirmed that she "watched the cameras,"[211] but little else.  Consider the following unanswered questions:

*How did Ms. Snyder come to work for U Lock in the first place?*
In terms of telling a convincing story, the beginning is a curious thing to leave out.

*Why was it necessary to monitor the Property?*  After all, Ms. Snyder never reported an incident to law enforcement in four years.[212]  Nor was there evidence that she ever alerted George to anything of importance.  And, to be blunt, it was a junkyard full of debris and scrap, so what required protection?

*How frequent were the push notifications and how much time was actually spent checking the cameras and contacting George?*
While the record is thin, there is more information about Ms. Snyder's personal activities during work hours than the work she actually performed.

---

[210]    *Post-Hearing Brief Regarding Shanni Snyder Claim and the Objection Thereto*, Dkt. No. 497 at 6.

[211]    *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 86:14-15; 108:3-6.

[212]    Id. at 81:4-12.

> *Who monitored the Property after Ms. Snyder quit in February 2020?*  Did anyone?  The answer would seem to bear on the likelihood that Ms. Snyder did so previously.
>
> *Why stop at 3 a.m.?*  The time appears arbitrary since it neither reflects a standard eight-hour work shift nor is it a full night shift.
>
> *What happened after 3 a.m.?*  Remember that only Ms. Snyder had remote access to the cameras, so George or Kash would have to go to the Property to relieve her between 3 a.m. and 5 p.m.
>
> *How was Ms. Snyder able to remotely access the cameras at all if U Lock did not have Wi-Fi at the time?*  She did not say, George did not know,[213] and Kash generally professed "limited knowledge."[214]  Was this issue not raised during the evidentiary hearing because Ms. Biros received a satisfactory answer through discovery?
>
> *Why did George not acquire his own dropcams or download the application to monitor them himself?*  Whatever the economic realities of U Lock, the cost of a few webcams should have been an achievable investment if 24-hour surveillance was necessary.  But even if U Lock needed Ms. Snyder to supply the cameras, why have her monitor them?  And why would Ms. Snyder want to be an unpaid middleman forwarding alerts to George when they could have been sent to him directly?
>
> *Why did the Department of Labor visit Ms. Snyder's home?*  In the absence of any explanation, the Court is left to envision a world in which officials go door-to-door like an evangelical sect spreading the "good news" about potential wage claims.

These details are so obviously relevant that the Court cannot help but view their absence as calculated.[215]

In any event, Ms. Snyder insists that she worked ten hours a night, seven days a week, for four years without a single sick day, vacation, or assistance with her three children.

---

[213]     *Exhibit 16* at 80:22-81:2.

[214]     *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 108:3-6.

[215]     Given the shifting burdens, the Court surmises that Ms. Biros' counsel intentionally avoided throwing Ms. Snyder a rope as to these matters on cross-examination.

Ms. Biros argues this feat is implausible,[216] an "insinuation" Ms. Snyder shrugs off as

unproven.[217]   Normally, a Cal Ripken-esque 1,506-day streak of ten-hour workdays would seem

unrealistic (and perhaps unlawful).   But the idea that someone would do that without pay is

downright fanciful.   To combat this perception, Ms. Snyder steered into the skid, contending that

"work" essentially meant having her iPhone handy.   Far from time being "dedicated" or "set

aside,"[218] she apparently went about her day until she received a push notification.   That is, Ms.

Snyder cared for her young children, cooked meals, socialized outside her home, and slept.[219]

And, as she would have it, even childbirth and the accompanying hospitalization did not interfere

with her work for U Lock.[220]   But Ms. Snyder also asserts that her work was not completely

passive: "there were times in the day I would watch it, too."[221]

Even before weighing credibility, Ms. Snyder's testimony is problematic on its

face.   There is inherent tension between portraying her work as real and substantial and the

seeming lack of any disruption to her personal life or objective evidence supporting its

occurrence.  Ms. Snyder's attempts to temper her over-the-top assertions, like the suggestion that

a daily ten-hour work schedule was uninterrupted by childbirth, necessarily minimize her alleged

commitment to U Lock.   It is the difference between monitoring *cameras* and monitoring

*notifications* from cameras.   At the same time, rather than defend the materiality of relying on

phone alerts alone, Ms. Snyder vaguely maintains that she sometimes watched the camera

---

[216]   *Post-Trial Brief in Support of Christine Biros' Objection to Shanni Snyder's Proof of Claim*, Dkt. No. 498 at 17-19.

[217]   *Post-Hearing Brief Regarding Shanni Snyder Claim and the Objection Thereto*, Dkt. No. 497 at 6.

[218]   *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 36:14-15.

[219]   Id. at 16:3-10, 17:17-18:6, 78:9-24.

[220]   Id. at 36:1-7.

[221]   Id. at 16:9-10.

feed.[222]  So all the Court has is her word that she performed some nebulous services while doing other things without any sense of the actual effort or time expended.

Ultimately, "[t]he lady doth protest too much, methinks."[223]  The Court does not believe that Ms. Snyder ever watched the cameras without a prior notification because doing so makes as much sense as watching a phone to see if it will ring.  Nor is it convinced that she monitored camera alerts on her phone to any substantial degree.  Frankly, there is an inverse relationship between Ms. Snyder's credibility and the amount of work claimed given her testimony's bizarre mix of exaggeration and contradiction.  After all, why would anyone keep working ten hours a day for four years without payment?  Her testimony shunned any degree of detail about her alleged work in favor of self-serving, generalized statements that raise more questions than they answer.  And Ms. Snyder's vehemence that her testimony must be accepted if not disproven misapprehends her burden and overestimates her credibility.

But Ms. Snyder's testimony was not unrebutted—her own contemporaneous bankruptcy declarations explicitly refute her present testimony in support of a wage claim.  As does her declaration in the child custody matter.[224]  Taking all as true, Ms. Snyder signed a sworn declaration that she was neither employed nor owed wages in between two ten-hour work shifts while expecting roughly $50,000 in wages.  She dances around this paradox with feeble excuses: that she did not understand the direct questions asked, view herself as employed, or know that she could sue U Lock for unpaid wages.  The Court is floored by the jarring dichotomy of presenting Ms. Snyder as a savvy pro se litigant who is simultaneously befuddled

---

[222]    Id.

[223]    WILLIAM SHAKESPEARE, *HAMLET*, Act III, Scene 2.

[224]    *Exhibit 1* at BIROS_00001-02.

when asked to list "amounts someone owes you" including "[u]npaid wages."[225]   That Ms.

Snyder could obtain a lis pendens—a fairly esoteric legal mechanism—but not understand that

she was owed wages that were promised for completed work is preposterous.  If anything, it is

more noteworthy that Ms. Snyder, much like George and Kash, testified that she did not actually

consider herself "employed" by U Lock at the time.[226]  Her change in position comes across as

opportunistic, even if the Department of Labor's convenient house-call is less far-fetched than it

sounds, given its timing and her failure to promptly amend her schedules.[227]   In sum, Ms.

Snyder's efforts to distance herself from her prior sworn statements are not credible.

Ironically, the agreement described by Ms. Snyder and George is likely the most

plausible aspect of their testimony, but it is irreconcilable with the wage claim she asserts.

Indeed, Ms. Snyder consistently expressed George's promise to pay her as conditional:

> [George] promised to pay _when_ things got straightened out, _if_ he
> got a mortgage on the place, _if_ the property were developed. You
> know, he kept promising he would pay. It continued. He promised
> over and over.[228]
>
> * * *
>
> And [George] said he would pay in the beginning.  He said, _when_
> we got things straightened out.  You know, there were legal issues
> with the Biroses. . . .   And we were waiting on that money _maybe_
> to clear up after 2018.[229]
>
> * * *

---

[225]    *Exhibit 2* at BIROS_000023.

[226]    *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 41:2-8, 45:16-18, 46:4-8, 46:23-47:1,
62:17-19, 63:19-64:5.

[227]    To be clear, Ms. Snyder gets no credit for amending her schedules three years later after this Court advised
her to do so.

[228]    *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 18:16-19 (emphasis added).

[229]    Id. at 18:25-19:4 (emphasis added).

> [Ms. Snyder expected] [a]t least minimum wage, but [George] at
> one point said he would give me more.  _If_ it were developed and it
> took off, it could have been a commercial, a strip mall, whatever it
> was.[230]

During the evidentiary hearing, George's testimony was non-committal:

> In some way, shape, or form. . . .  I was eventually planning on
> paying everybody.[231]

> \* \* \*

> [W]e had big plans for the property, and I figured there would be
> money to pay at the end.[232]

At the meeting of creditors, however, he made clear that he viewed their agreement as contingent

on the development of the Property:

> [The agreement was] [j]ust that she would get something _when_ . . .
> we got . . . everything off the ground.[233]

> \* \* \*

> [Ms. Snyder]'s my sister, and I thought it was more of a favor and
> the understanding was _when_ we developed the property, she would
> get something.[234]

Assuming Ms. Snyder and George testified truthfully, they outlined an agreement to share the

profits of a real estate venture, not an employment agreement.  This is supported by the

conditional promise of compensation, the economic realities of U Lock, and the fact that no

one—Ms. Snyder included—considered her an employee.

   The conditional promise to an undefined share of profits from a property venture

bears no relation to the wage claim Ms. Snyder filed in the District Court.  Her expectation of a

---

[230]    Id. at 19:5-8 (emphasis added).

[231]    Id. at 86:18-20.

[232]    Id. at 88:2-3.

[233]    _Exhibit 16_ at 21:17-21 (stammering omitted, emphasis added).

[234]    Id. at 64:23-65:1 (emphasis added).

minimum wage appears largely one-sided, to have arose after the fact, and stems from her discovery of the FLSA rather than any agreement with George. Worse still, the allegation that Ms. Snyder was to be paid monthly conflicts with their testimony that she would be paid "if" or "when" the Property was developed. Therefore, as previewed in the introduction to this *Memorandum Opinion*, the Court finds that Ms. Snyder lied to the District Court to establish her wage claim, and then to this Court in pressing it.

It is not hard to discern why Ms. Snyder fabricated her claim: to manufacture a means to continue the litigation against Ms. Biros in hopes of recapturing the Property. The first thing Ms. Snyder did ostensibly to enforce her judgment against U Lock was to cloud the title to the Property already awarded to Ms. Biros. Certainly, the avowed purpose of U Lock's chapter 7 was to avoid the transfer of the Property to Ms. Biros as a preference or fraudulent transfer. For that reason alone, Ms. Snyder's assertion that she was unsure if Ms. Biros prevailed against U Lock in the state courts is absurd. So again, "[t]he lady doth protest too much,"[235] further damaging her credibility.

The timing of Ms. Snyder's actions is also revealing. First, she "discovered" her wage claim two months after the Superior Court affirmed the imposition of a constructive trust on the Property and only days before re-argument was denied.[236] Next, Ms. Snyder only asserted an interest in the Property after the Supreme Court denied U Lock's leave to appeal despite obtaining the judgment five months earlier.[237] Finally, U Lock's involuntary petition appears timed to stay the Prothonotary from issuing a writ of possession in favor of Ms. Biros.

---

[235]     WILLIAM SHAKESPEARE, *HAMLET*, Act III, Scene 2.

[236]     See Biros v. U Lock Inc., 255 A.3d at 489, re-argument denied (July 28, 2021).

[237]     It is important to remember that Ms. Snyder disagrees with the Court (and the District Court) that the Trial Court's order necessarily held that U Lock never owned the Property's equitable interest. So from her perspective, her judgment clouded U Lock's interest before it could be transferred to Ms. Biros.

Frankly, the wage claim is transparently a means to an end.  On the one hand, Ms. Snyder demanded nearly $130,000 in unpaid wages from U Lock, insisting that she implausibly worked ten hours a day for four years straight.  Yet during the evidentiary hearing, she testified that she "was willing to reduce [her] claim to have *a claim*," acknowledging that U Lock lacked funds to pay any.[238]  This statement is curious because U Lock never had the capacity to pay— that was why her alleged compensation was deferred.  Given that Ms. Snyder was always aware of that, the Court perceives her contrasting approach to her claim as utilitarian.  Outside of bankruptcy, it was strategically necessary to have a large judgment to sufficiently cloud title to the Property, but any claim will afford standing to participate in a bankruptcy case.  Sometimes people accidentally say what they really think.

In a similar vein, Ms. Snyder's conduct reveals that she was never serious about collecting a wage claim.  She knew U Lock lacked the financial resources to satisfy a judgment, but did not pursue George, Kash, or the Biroses as U Lock's responsible parties.[239]  Instead, Ms. Snyder opted to sue U Lock alone and then assert a lien against a property U Lock did not own based on a Trial Court order affirmed on appeal.[240]

Finally, the Court observes (without necessarily finding) that there is also ample reason to believe that others helped facilitate Ms. Snyder's fraud.  George's conduct is particularly suspect.  He did not oppose Ms. Snyder's wage claim in the District Court despite not believing she was an employee and, as previously suggested, his own potential personal liability.  George is also surprisingly agnostic about whether Ms. Snyder was truthful with the

---

[238]    *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 60:4-5 (emphasis added).

[239]    The Court mentions the Biroses not because there is evidence that Ms. Biros and her brother were U Lock's responsible parties, but because Ms. Snyder has repeatedly alleged that they were in control of U Lock.

[240]    In fact, the Trial Court's order would have been final but for the Supreme Court of Pennsylvania staying the remand to permit U Lock to petition the United States Supreme Court for review.  See In re U Lock, Inc., 652 B.R. at 461.

District Court.[241]  And the Court recognizes that he began walking back his state court testimony that U Lock had no employees soon after this case was filed.[242]

Having analyzed the wage claim, it is apparent that it would not have withstood any degree of scrutiny if challenged.  In fairness, George's economic justification to permit the default is far from far from irrational.  Yet his averment that he did not inform U Lock's counsel that Ms. Snyder commenced the FLSA action does not look innocent.  If credible, hiding such a detail from counsel suggests George's complicity in her fraud.  If not, his testimony is a naked attempt to insulate counsel from their scheme.  The Court also notes that the timing of certain state court pleadings hints at coordination between U Lock's counsel and Ms. Snyder.[243]

For today, it is enough to find that Ms. Snyder's wage claim was a sham and disallow it in its entirety.  But the fraud on *this* Court cannot go unanswered, so she will be required to show cause why sanctions should not be imposed.

That said, the Court cautions that prudential concerns will necessarily limit the scope of the show cause proceedings.  Only the District Court can address the fraud that precipitated the judgment.  Also, judicial economy (particularly given the inevitability of appeals) urges that any determination of Ms. Biros' damages arising from Ms. Snyder's fraudulent conduct be resolved through the pending RICO action.  As it stands, the Court's focus is two-fold: (1) the estate's administrative insolvency must be remedied; and (2) Ms. Snyder's chapter 7 trustee, who was unnecessarily reappointed to administer a fraudulent claim, should

---

241     *Exhibit 16* at 27:23-28:16.

242     <u>See, e.g.</u>, <u>id.</u> at 63:1-65:13; *Transcript of July 14, 2023 Evidentiary Hearing*, Dkt. No. 488 at 95:17-97:15.

243     <u>Compare</u> *Exhibit 13* <u>with</u> *Exhibit 14*.

not be out of pocket either.  Absent any general unsecured creditors other than Ms. Biros, there is little point to prolonging the final disposition of this case with additional litigation.[244]

## IV.     CONCLUSION

In light of the foregoing, Ms. Snyder's proof of claim is disallowed in its entirety. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate order consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

Dated: February 29, 2024

_____

GREGORY L. TADDONIO
CHIEF UNITED STATES BANKRUPTCY JUDGE

Case administrator to mail to:
Debtor
George Snyder
Charles O. Zebley, Jr.

---

[244] The Court is also mindful that an order to show cause will likely be held in abeyance due to an appeal of this *Memorandum Opinion*.

38

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Response of Christine Biros to Motion of George Snyder for Reconsideration of Motion of Dismissal was served this 18th day of March, 2024, upon all counsel and parties of record via this Court's CM/ECF system.

*/s/ Stuart C. Gaul, Jr.*